NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
### DIVISION ONE

MICHAELA F., BRIAN F., *Appellants*,

*v.*

BENJAMIN A., T.A., *Appellees*.

No. 1 CA-JV 19-0348
FILED 4-7-2020

Appeal from the Superior Court in Maricopa County
No. JS519131
The Honorable Cynthia L. Gialketsis, Judge *Pro Tempore*

**AFFIRMED**

COUNSEL

Michaela F. & Brian F., Phoenix
*Appellants*

Denise L. Carroll, Scottsdale
*Counsel for Appellee, Benjamin A.*

------------------------------

## MEMORANDUM DECISION

Presiding Judge Michael J. Brown delivered the decision of the Court, in which Judge Kenton D. Jones and Judge D. Steven Williams joined.

------------------------------

**B R O W N**, Judge:

¶1          Michaela F. and Brian F. ("Appellants") appeal the juvenile court's order denying their petition for termination of Benjamin A.'s ("Father") parental rights to his daughter, T.A. ("the child"). For the following reasons, we affirm.

## BACKGROUND

¶2          Father and Melissa G. ("Mother") are the biological parents of the child, who was born in 2012. Mother and Father lived together until the child was about nine months old. In 2014, the family court awarded Mother and Father joint legal decision-making and equal parenting time. Despite the order, the child stayed in Mother's custody, but Mother asked Appellants (the child's maternal aunt ("Aunt") and uncle) to care for the child. The child has been in Appellants' care for approximately five years; she refers to them as "mom and dad," and they desire to adopt her.

¶3          In 2016, Aunt filed a petition to terminate Father's parental rights, alleging abandonment. Following a four-day evidentiary hearing, in January 2018 the juvenile court (Judge Arthur Anderson) denied the petition, finding that Father's repeated attempts to contact Mother demonstrated he had not abandoned the child. *Michaela F. v. Benjamin A., T.A.*, 1 CA-JV 18-0040, 2018 WL 3853693, at *2, ¶ 11 (Ariz. App. Aug. 14, 2018) (mem. decision). Judge Anderson also declined to terminate Mother's parental rights, even though she had consented, because it would leave Father as the only legal parent and would not serve the child's best interests. *Id.* The court then ordered DCS to investigate whether the child was dependent as to Father. *Id.* Aunt then appealed Judge Anderson's ruling to this court. *Id.* at ¶ 12.

¶4          When DCS initially contacted Father, he refused to do a drug test or psychological evaluation. Because of Father's significant absence from the child's life, DCS put a safety plan in place on April 25, 2018. Appellants, Father, Mother (by phone), and one of Father's sisters attended

a Team Decision Making ("TDM") meeting on May 2, 2018, as a follow-up to the juvenile court's order directing DCS to investigate Father's circumstances, and to discuss the safety plan. Two psychologists, Dr. Fore (the child's therapist), and Dr. Dibacco (a DCS therapist), also participated in the TDM. They discussed therapeutic visitation counseling to introduce the child to Father. Dr. Fore explained that for the child, spending time with Father would be like spending time with a complete stranger. She recommended that they start getting to know one another in therapy. Mother stated that Father is unstable. At the end of the TDM, DCS indicated there was not enough information to assess Father as a safe parent, and thus DCS determined it would assume immediate custody of the child and file an out-of-home dependency. DCS stated it would continue to assess Father "for safety and develop Conditions for Return," but Father was not to have contact with the child "at this time." The child was to remain with Appellants, and Mother could have supervised visits. Dr. Fore understood that the plan was for the child and Father to be introduced slowly, with Dr. Fore's participation.

¶5        Around the same time, Father signed a "90-day voluntary" agreement that allowed Appellants to keep the child for 90 days while DCS completed its investigation. Father expected that at the conclusion of the 90 days he would be informed about the next steps. According to Father, he participated in drug testing after the TDM.

¶6        On May 4, 2018, DCS filed a dependency as to Father, but the court denied the petition because the child was not dependent on the State—the child was under Appellants' care, and there was no imminent concern regarding Father. On May 10, DCS developed an aftercare plan and discussed it with Mother and Father by phone. The plan indicated that Mother and Father would resume 50/50 custody and that DCS no longer had legal custody of the child. Father asserted he was not aware of this; he believed DCS involvement ended in August. At that time, Father was fine with the aftercare plan and did not want to take the child away from her mother, who was terminally ill.

¶7        Mother passed away in June 2018. Her dying wish was for the child to remain with Appellants permanently. Father contacted Aunt through a Facebook message in July. He told her he "hope[d] you guys [are] healthy still [and] doin[g] well. Think[ing] [a]bout [the child] always." Aunt responded that they were "absolutely willing to negotiate a Post-Adoption Agreement with [Father], giving [him] time to begin and maintain a relationship with [the child] upon completion of Adoption." Aunt stated she was "not interested in dragging this on through court until

[the child] is 18." Father replied that the courts had consistently decided in his favor and asserted that Appellants had no legal rights to the child. Father said he could provide an address to Aunt for when she was ready to meet. A few days later, Father asked Aunt if she had considered complying with the court's orders to allow him visitation or a phone conversation with the child.

¶8 In August 2018, this court affirmed Judge Anderson's order denying Aunt's first petition to terminate Father's parental rights. *Michaela F.*, 1 CA-JV 18-0040, at *1, ¶ 1. We explained in part that although evidence existed from which the juvenile court "could have determined that Father did not make sufficient efforts to maintain contact with [the child], the record also supports the court's conclusion that Father had not abandoned [her], but rather that Mother's interference had thwarted his efforts to remain in his daughter's life." *Id*. at *3, ¶ 16. For example, we noted that Mother kept the child from Father for two and a half years. *Id*. at *1, ¶ 7. Mother failed to show up for scheduled exchanges so Father could not see the child. *Id*. Father emailed and called Mother asking to see the child, but for the most part, Mother did not respond. *Id*. Mother also alleged that Father sexually abused the child. *Id*. at *1, ¶ 4. Both DCS and law enforcement investigated Mother's allegations, but they were unfounded. *Id*.

¶9 In October 2018, Father contacted Aunt again, and this time Aunt informed him that Mother had died. Father responded to Aunt in December, asking when he could schedule visits with the child. Aunt replied that therapeutic counseling needed to occur as a means to introduce Father to the child and confirmed that her position on adoption had not changed.

¶10 On December 10, 2018, Father filed a motion to modify parenting time in family court, but the motion was later dismissed on procedural grounds. The next day, presumably by coincidence, Appellants filed their petition to terminate Father's parental rights, alleging abandonment and neglect. On March 17, 2019, Father filed a petition to modify legal decision-making in family court. On March 22, Father filed a motion to dismiss the termination and return the child to him. The court denied the motion and explained that the family court was responsible for any outstanding custody and visitation issues. The court then stated it was "requesting" that the family court "not stay the issue."

¶11 On April 15, 2019, the family court set a hearing regarding visitation. On May 15, the family court conducted a resolution

management conference, granting a stay of the petition despite the juvenile court's request.

¶12      Following a three-day termination hearing, the juvenile court denied the petition. In its ruling, the court first explained that the parties had agreed the relevant time period for assessing Appellants' allegations for termination started on January 18, 2018, when the first petition was denied, to the present. The court and parties also acknowledged that "information as it relates to the relationship Father has had with the child historically would be relevant" to allow the court to see the entire picture, and the court "would consider the previous case as needed for historical context." The court therefore took judicial notice of that docket. After analyzing the applicable law and pertinent evidence, the court determined that Appellants failed to establish by clear and convincing evidence the alleged grounds for termination. This timely appeal followed.

## DISCUSSION

¶13      The juvenile court is authorized to terminate a parent-child relationship if clear and convincing evidence establishes at least one statutory ground for termination and a preponderance of the evidence shows that termination is in the child's best interests. A.R.S. § 8-537(B); *Michael J. v. Ariz. Dep't of Econ. Sec.*, 196 Ariz. 246, 248–49, ¶ 12 (2000); *Kent K. v. Bobby M.*, 210 Ariz. 279, 288, ¶ 42 (2005). As the trier of fact, the juvenile court "is in the best position to weigh the evidence, observe the parties, judge the credibility of witnesses, and make appropriate findings." *Jesus M. v. Ariz. Dep't of Econ. Sec.*, 203 Ariz. 278, 280, ¶ 4 (App. 2002). We will not disturb the court's ruling absent an abuse of discretion or unless there is no reasonable evidence to support the court's findings. *Mary Lou C. v. Ariz. Dep't of Econ. Sec.*, 207 Ariz. 43, 47, ¶ 8 (App. 2004). We view the evidence in the light most favorable to affirming the court's findings. *Michael J.*, 196 Ariz. at 250, ¶ 20. We do not reweigh the evidence, and we defer to the fact-finder's resolution of any conflicts in the evidence. *See Vanessa H. v. Ariz. Dep't of Econ. Sec.*, 215 Ariz. 252, 257, ¶ 22 (App. 2007).

### A.    Abandonment

¶14      Whether a parent has abandoned his or her child requires an objective analysis of the parent's conduct, not the parent's subjective intent. *Michael J.*, 196 Ariz. at 249, ¶ 18. Abandonment is defined as:

> [T]he failure of a parent to provide reasonable support and to maintain regular contact with the child, including providing normal supervision. Abandonment includes a judicial

5

finding that a parent has made only minimal efforts to support and communicate with the child. Failure to maintain a normal parental relationship with the child without just cause for a period of six months constitutes prima facie evidence of abandonment.

A.R.S. § 8-531(1). Accordingly, when faced with obstacles to a continuing parental relationship, a parent must "act persistently to establish the relationship however possible and must vigorously assert his legal rights." *Michael J.*, 196 Ariz. at 250, ¶ 22 (citations omitted). But we also recognize that "a parent who has persistently and substantially restricted the other parent's interaction with their child may not prove abandonment based on evidence that the other has had only limited involvement with the child." *Calvin B. v. Brittany B.*, 232 Ariz. 292, 293–94, ¶ 1 (App. 2013). "What constitutes reasonable support, regular contact, and normal supervision varies from case to case," and thus "questions of abandonment . . . are questions of fact for resolution by the trial court." *Michael J.*, 196 Ariz. at 250, ¶ 20 (citations omitted).

**¶15** Appellants argue the juvenile court erred in finding they failed to prove Father abandoned the child, asserting the court abused its discretion by failing to find that he abandoned the child "after more than six months without any form of contact with the child, no effort to communicate with the child, and no parent-child relationship."

**¶16** The juvenile court explained that the child has lived with Appellants full-time since she was three, and for a period of time before that, "all with Mother's consent." The court found that Father has had no physical contact with the child since she was 15 months old, and he has no parent-child relationship with her. According to Judge Anderson, those circumstances were caused "by Mother's defiance of family court orders and Mother's failure to respond to Father's email attempts."

**¶17** In evaluating Father's efforts, the juvenile court expressly noted a number of concerns about his failure to take steps toward establishing a relationship with the child. For example, (1) Father's lack of effort to set up therapeutic visits with child since the TDM; (2) Father had Dr. Dibacco's contact information from the TDM but never called him; (3) Father never reached out to Dr. Fore to set up any type of therapeutic intervention or ask about how to begin that process; (4) Father claimed he did not believe it was practical to set up the appointments because he did not believe Appellants would cooperate; (5) Father said he did not want to "rock the boat" as an explanation for not attempting to initiate more

contact; (6) Father has not provided financially for the child; and (7) Father stated he has gifts for the child but presented no evidence.

**¶18**　　　　The juvenile court also found that Father (1) participated in a home visit; (2) attended the TDM; (3) agreed to cooperate with DCS; (4) signed a 90-day voluntary agreement; (5) believed he could not have contact with the child until the 90-day period passed, which would have been August 2018; (6) reached out to the Appellants in July, but it was made clear to him that Appellants wanted to adopt the child; and (7) filed a petition to modify legal decision-making, parenting time, and child support in December 2018, and re-filed it in March 2019 after it was initially dismissed.  In concluding Father did not abandon the child, the court recognized "Father could have done more" but made "more than minimal efforts" by participating in the home visit, the TDM, ultimately cooperating with DCS, signing the 90-day voluntary agreement, "reaching out to Petitioners and filing documents with family court."  The court also expressed its concern that Appellants "waited months to advise Father of Mother's death, knowing there were Family Court orders in place and that Father was the only legal parent at the time."[1]  Reasonable evidence in the record supports these findings.

**¶19**　　　　Considering the context of the entire case, but focusing specifically on the relatively short timeframe outlined by the juvenile court, Appellants have failed to identify any six-month period where Father made only minimal efforts *without just cause*.  *See* A.R.S. § 8-531(1).  Until May 2018, Father was waiting for DCS to end its investigation before reaching out to Aunt, which he did in July.  From May to August, he believed he was not allowed to have contact with the child based on the 90-day voluntary agreement entered into after the TDM meeting.  Mother did not pass away until June, and Father was not informed of her passing until October.  Although he certainly could have done more, and acted more promptly, Father did make at least some efforts to stay in touch with Aunt, check in regarding the child, and inquire as to when he could spend time with the

---

[1]　　　　The juvenile court aptly recognized that its decision "sadly leaves the parties in the same situation as they were" at the time of Judge Anderson's ruling, in that Father is unable to parent due to significant absence in the child's life, with the now added factor that Mother is deceased.  The court directed DCS to start another investigation and file a dependency, if appropriate, explaining that if no parent is currently able to parent, a dependency petition would likely be needed.  The court also expressed its hope that Appellants, who "have done a wonderful job" in raising the child, would continue to be an important part of her life.

child. Additionally, he opposed Aunt's appeal of Judge Anderson's decision, continued to seek relief in the juvenile court by opposing the second petition for termination, including filing a motion to dismiss the petition and return the child to him, and he made pertinent filings in the family court seeking to change the 2014 order.

¶20 Moreover, the juvenile court's concern regarding Aunt's failure to communicate is justified. Aunt waited to inform Father of Mother's death for several months after Mother died. When Father reached out to Aunt in July of 2018, she said nothing about Mother's passing. Furthermore, when Father made that inquiry, Appellants plainly took the position that Father's only option was to discuss a post-adoption relationship in the child's life; reunification was apparently out of the question. Appellants were free to take that position; however, it was also a factor the juvenile court could properly consider in deciding the reasonableness of Father's efforts, and whether they were more than minimal or whether Appellant's position provided good cause for his lack of effort in seeking the return of his child. *Cf. Calvin B.*, 232 Ariz. at 297, ¶ 21 ("A parent may not restrict the other parent from interacting with their child and then petition to terminate the latter's rights for abandonment.")

¶21 In sum, the juvenile court was in the best position to weigh testimony and evidence presented at the termination hearing, and we will not substitute our judgment for that of the juvenile court. *Maricopa County Juvenile Action No. JD-500200*, 163 Ariz. 457, 461 (App. 1989). While we acknowledge that Father could have taken a number of additional steps in his effort to establish a relationship with his child, we cannot say the court's decision was "manifestly unreasonable," or "based on untenable grounds or for untenable reasons." *See Kimu P. v. Ariz. Dep't of Econ. Sec.*, 218 Ariz. 39, 42, ¶ 11 (App. 2008) (citation omitted); *see also State v. Slover*, 220 Ariz. 239, 242, ¶ 4 (App. 2009) (A court abuses its discretion when it "misapplies the law or exercises its discretion based on incorrect legal principles."). Nor can we conclude that the record lacks any reasonable evidence supporting the court's findings. Thus, the court did not err in denying Appellants' petition relating to abandonment.

## B. Neglect

¶22 Appellants also argue the juvenile court erred in denying their petition to terminate Father's parental rights based upon neglect due to his failure to provide healthcare to the child when she came into their care as well as Father's inability to provide for himself, which shows he will not be able to provide for the child's basic needs. *See* A.R.S. § 8-533(B)(2).

Neglect is "[t]he inability or unwillingness of a parent . . . to provide [a] child with supervision, food, clothing, shelter or medical care if that inability or unwillingness causes unreasonable risk of harm to the child's health or welfare." A.R.S. § 8-201(25)(a). The juvenile court recognized that "Father has not provided food, shelter, clothing, etc. for the child." The court then explained, however, that the evidence does not support a finding that his failure to provide support "caused unreasonable risk of harm to the child's health or welfare." Appellants do not argue, nor have they directed us to any evidence in the record, that Father's inaction has caused an unreasonable risk of harm to the child's health or welfare. Thus, we find no abuse of discretion.[2]

**CONCLUSION**

**¶23**　　　　We affirm the juvenile court's order denying the petition for termination.



AMY M. WOOD • Clerk of the Court
FILED: AA

---

[2]　　　　Because the superior court did not find either ground for termination was proven (i.e., that Father is unfit to parent), we do not address Appellants' argument relating to best interests. *See Kent K.*, 210 Ariz. at 285, ¶ 31 ("Once a court determines that a parent is unfit, the focus shifts to the interests of the child as distinct from those of the parent.").